CASES IN CHANCERY, 1915. 415

*84 N. J. Eq.*    Wright *v.* American Finance & Securities Co.

---

ALFRED S. WRIGHT et al.

*v.*

THE AMERICAN FINANCE AND SECURITIES COMPANY.

[Submitted March 30th, 1915.    Decided April 8th, 1915.]

1. A corporation organized to promote and finance other corporations, whose authorized capital stock was all "water," issued to a subsidiary company and used in promoting the sale of special contract bonds, whose liabilities from the start exceeded its assets by $250,000, which had defaulted in interest payments, in taxes to the state, and in the payment of other claims, and all of whose subordinate companies whose stock it held were either bankrupt or defunct, and which itself had begun a policy of retrenchment amounting almost to a suspension of business, and which had no funds to carry on its business, was bankrupt and insolvent, within the statute; the term "insolvency" denoting a general inability to meet pecuniary liabilities as they matured, either from available assets or any honest use of credit, and not negatived because one may ultimately have a surplus, after winding up his affairs.

2. In such case, where the company had no hope of new capital, or any reasonable prospect of paying the principal and interest of its bonds through which the public had already suffered a loss, and where its officials had maladministered its affairs, an injunction will issue against it, and a receiver be appointed.

*Mr. Scott Scammell,* for the complainants.

*Mr. J. Fithian Tatem,* for the defendant.

BACKES, V. C.

This bill sets forth that the defendant company is insolvent and prays for an injunction and the appointment of a receiver. A temporary receiver was appointed, and an order to show cause issued, upon the return of which the defendant filed an answer, with affidavits annexed, denying insolvency, and on the hearing the witnesses on both sides were heard in open court.

The defendant was formed in 1903, chiefly for the purpose of promoting and financing other corporations. It was organized with an authorized capital of $5,000,000, divided into fifty thousand shares of the par value of $100 each. For the purpose of putting it in funds, the defendant created an issue of one and a quarter million dollars of bonds, called "Special Contract Bonds," which it sold or agreed to sell to the Eastern Finance Company, another creature of the promoters of the defendant, at eighty per cent. or for $1,000,000. The whole of the $5,000,000 of capital stock was issued to the Eastern Finance Company, in exchange for holdings of that company in still other companies formed by the same promoters, all of which had but a fancied, or no, value. The $5,000,000 of capital stock was "water" and was used to promote the sale of the special contract bonds, the purchasers of the latter being given blocks of the stock as bonus. A subsidiary company of the Eastern Finance Company was to be used to sell the special contract bonds to the public, but upon this method falling through or being abandoned, the defendant itself made the sales which yielded, as it claims, the contract price of the Eastern Finance Company, of $1,000,000 in this manner. As the contract bonds were sold from time to time, eighty per cent. of their face value was credited to the account of the Eastern Finance Company, until the one million dollar figure was reached, and the account was squared. The difference between the eighty per cent. and the amount for which the bonds were sold, was absorbed in organization and operation

expenses. The Eastern Finance Company still holds twenty-seven thousand, five hundred shares of the defendant, the remaining twenty-two thousand, five hundred shares having been handed over, as occasion required, to the purchasers of the special contract bonds. Up to this point in the history of the defendant it appears that it was launched upon the financial world with possible assets of not more than $1,000,000 and fixed liabilities of one and a quarter million dollars of bonds, plus $5,000,000 of capital stock.

It would, indeed, make interesting reading, to review the career of the defendant, its exploitations and vicissitudes of fortune, from its inception to the present application, so ingenuously related on the witness-stand by its president, but it would be without profit, and I will therefore confine myself to adverting only to those operations which have a bearing upon the present question of insolvency, and these I will discuss mainly, if not entirely, from the case as made by the defendant.

The financial condition of the defendant, as of December 31st, 1914, is shown by its balance-sheet, which was distributed among its stock and bondholders:

### GENERAL BALANCE SHEET.

#### December 31st, 1914.

All figures, both debit and credit. represent face values.

Assets :

| | | |
|---|---|---|
| First mortgage bonds, par value......... | $372,900.00 | |
| Preferred stocks, par value.............. | 7,800.00 | |
| Cash ................................. | 3,244.71 | |
| Bills and accounts receivable............. | 984,152.67 | |
| Common stock of subsidiary companies, par value ............................. | 6,266,975.00 | |
| Furniture and fixtures................. | 948.34 | |

Liabilities :

| | |
|---|---|
| Accounts payable ...................... | $23,214.88 |
| Bond interest accrued................... | 187,500.00 |
| Income bonds ......................... | 1,250,000.00 |
| *Capital Stock ........................ | 500,000.00 |
| *Surplus .............................. | 5,675,305.84 |

|  | $7,636,020.72 | $7,636,020.72 |
|---|---|---|

*Owing to the recent reduction of the par value of our capital stock from $5,000,000 to $500,000, our liabilities are nominally decreased $4,500,000 and our "surplus" is thereby correspondingly increased. Had no change been made in the par value of our shares, our "surplus" would be $1,175,305.84, the relative value of shares being the same in either instance.

I hereby certify that the general balance sheet is correct and that the same agrees with the books of the company.

C. J. SCHLAECHTER,
Philadelphia, January 29th, 1915.　　　　　　　　　　　　　*Treasurer.*

It will be noted, as the balance-sheet states, that "All figures, both debit and credit, represent face values," only. The observation at the bottom of the sheet is amazingly frank in calling attention to how the "surplus" was swelled to an attractive figure. To this reference will be made later on. I will analyze the assets in the light of the testimony before me.

The largest item is "Common stock of subsidiary companies, par value $6,266,975." This is made up of the common stock of the following companies:

| | |
|---|---:|
| Guanajuato R. & M. Company | $2,217,580 |
| Empire Lumber Company | 1,091,400 |
| New Jersey Steel Co | 454,980 |
| El Tiro Copper Company | 2,503,015 |
| | $6,266,975 |

These companies were all created by the defendant or its promoters. The capital stock is only part of a larger issue of each company, and all "water," as the defendant admits, and as its president says was issued "to represent prospective profit if it should ever come." This was said with reference to one company, but it applies to the others. It might be well to give the *modus operandi* of the defendant's promotions and how it came into possession of the enormous amount of stock which it represented to its creditors and the public, as "assets." A subsidiary company would be formed to engage in a commercial enterprise. The subsidiary company would make a bond-issue running into the millions and far in excess of the cost to it of its property, which would be mortgaged to a trust company to secure the bonds. An issue of capital stock

would then follow, usually in double the amount of the bonds. The defendant marketed as many of the bonds as it could induce the public to buy, usually at eighty per cent., and gave to each purchaser a block of the capital stock, varying in amount, as the exigency demanded. Whatever of the bonds remained unsold and stock not given away, was treated by the defendant as its property and went to make up the "assets" of the general balance-sheet. The first item of the balance-sheet, "First Mortgage Bonds, par value $372,900," is made up of these unsold bonds, and are divided between the aforementioned companies as follows:

|  |  | Out of an issue of |
|---|---:|---:|
| Guanajuato Reduction and Mines Company... | $102,500 | $2,800,000 |
| Empire Lumber Company.................. | 11,900 | 2,344,000 |
| New Jersey Steel Company................ | 2,000 | 250,000 |
| El Tiro Copper Company................. | 256,500 | 1,256,500 |
| Total ............................. | $372,900 | |

The next item of "Preferred Stock, par value $7,800," is that of the New Jersey Steel Company. The third item of cash has been reduced to about $1,200, and was paid over to the temporary receiver. The fourth item of "Bills and Accounts Receivable, $984,152.67," is made up thus:

BILLS AND ACCOUNTS RECEIVABLE.

*Notes.*

| | | |
|---|---:|---:|
| The New Jersey Steel Co............... | $450,104.48 | |
| Mrs. M. Porter........................ | 8,500.00 | |
| L. H. Bott............................ | 500.00 | |
| Blanche Tracy ........................ | 500.00 | |
| | | $459,604.48 |

*Accounts.*

| | | |
|---|---:|---:|
| The Guanajuato R. & M. Co............. | $402,602.86 | |
| El Tiro Copper Co..................... | 28.51 | |
| The N. J. S. Co. Pfd. Stk. Int. advces.... | 68,250.00 | |
| Suspense account ..................... | 260.50 | |
| | | $471,141.87 |

| | |
|---|---:|
| Geo. W. Chase | $8,282.62 |
| E. C. Kenney | 944.24 |
| H. D. Moore | 600.00 |
| C. I. Goessman | 6,000.00 |
| G. D. Bouton | 3.21 |
| | $15,830.07 |
| | |
| Empire Lbr. Co. Int. coupons | $6,510.00 |
| The G. R. & M. Co Int. coupons | 3,075.00 |
| El Tiro Copper Co. Int. coupons | 22,095.00 |
| The N. J. S. Co. bond interest | 260.00 |
| | $31,940.00 |
| | |
| Empire Lumber Co. bond sales | $300.00 |
| Findley College | 2,000.00 |
| Postage purchase | 1.25 |
| | $2,301.25 |
| | |
| Development Co. of America, Coll. trust note | $1,000.00 |
| Congress Const. Mines Co. Ltd. Stk | 900.00 |
| Agents' stock purchase | 1,435.00 |
| | $3,335.00 |

$524,548.19

$984,152.67

The large sums due from the New Jersey Steel Company and the Guanajuato Reduction and Mines Company amounting to over $920,000, are for moneys loaned by the defendant to these companies, and accrued interest. The other items on the list, consisting of indebtedness from individuals, are conceded to be uncollectible. Let us now turn to an inspection of the present financial condition of the subsidiary companies, for mainly upon their standing turns the issue to be disposed of.

The Guanajuato Reduction and Mines Company is engaged in separating the left-over silver from the dumps of ancient mines in Mexico, which, under old methods, could not be extracted. The company has been able, so the defendant says, to pay the interest on its bonds, but is now in default on its last semi-annual installment due January 1st of this year. Owing

to the revolution in Mexico, the future operations of the company are in a very precarious condition. It is very frankly admitted by the defendant that, because of the state of unrest in that republic, there is no market for the sale of the bonds, and of course none for the stock, even though the public would otherwise be willing to buy. The president of the defendant stated that he would be able to sell the bonds of this company, held by the defendant, now amounting to $92,500 ($10,000 worth having recently been hypothecated to secure a $4,000 note), at fifty cents on the dollar, but not in the market. The only possible purchaser he had in mind was a gentleman who is an investor in the defendant's securities to the sum of a million dollars and upward and who probably could be persuaded to purchase, if by so doing the life of the defendant could be prolonged, but not otherwise. He also added that a large block of the capital stock would have to be given as an inducement. It may be unnecessary to say that this company never earned or paid any dividends on its common stock, and the likelihood of its ever doing so is far removed. The debt of $402,602.82, which it owes the defendant is of long standing—some seven or eight years—and at the present time absolutely uncollectible, owing, as the defendant says, to the prevailing disturbances.

The Empire Lumber Company is engaged in the lumber business in British Columbia. It suspended operations at the beginning of the present European war, although it is said to have since resumed trade. It is in default in the payment of the interest on its bonds and, of course, never paid any dividends on its capital stock, which has no market value and also no intrinsic value that has been demonstrated.

The El Tiro Copper Company, located at El Tiro, Arizona, long ago suspended business and is defunct. Although the bonds and capital stock of the face value of more than $3,000,000, are carried by the defendant as an asset, it cannot be denied that they are worthless. The defendant says their value is problematical. The bonds were brought into court and were found to be nothing but blank forms, unsigned, unsealed and uncertified by the trust company. The defendant says that it

could have them signed, sealed and certified by paying to the trustee fifty cents a piece for doing so, but it is quite evident that this outlay would be a squander.

The New Jersey Steel Company operated a plant at Rahway, in this state. It has been out of business since 1913, and is conceded to be bankrupt, its stock and bonds to be worthless and the debt due to the defendant of $518,614.48 uncollectible. The item in the foregoing statement of assets of "The N. J. S. Co. Pfd. Stk. Int. Advces. $68,250," is for money paid by the defendant to holders of the preferred stock of the New Jersey Steel Company, as dividends. The stock was put on the market by the defendant while these advances were being made, and the obvious purpose in making them was to lead the holders and possible purchasers into believing that the company was prosperous and earning the dividends.

This summary of the defendant's balance-sheet strips the stupendous "face values" assets of practically all virtue, leaving only, of possible, though not of probable, sales value, at fifty per cent., the $92,500 of the Guanajuato Reduction and Mines Company, and $11,900 of the Empire Lumber Company bonds, and cash of $1,200; at the most, a total asset, possible convertible at the present time into cash, of less than $55,000, out of which to meet liabilities of nearly one and a half million dollars. In the face of this tremendous deficit, counsel for the defendant strenuously insists that the defendant is not insolvent, and his argument is that the defendant owes no presently payable debts which it cannot liquidate, if given ten days' time; the point being that the special contract bonds of $1,250,-000, and the two and one half year's accrued interest of $187,-500, are not liabilities of the defendant in the legal sense; and this may be true. The terms of the bonds are that

"The company hereby agrees to pay  *  *  *  One thousand dollars  *  *  in twenty equal installments  *  *  *  out of a Retirement Fund created from the net surplus earnings of the company, as hereinafter stipulated  *  *  *  but not otherwise; also that the company agrees to pay  *  *  *  from an Interest Fund created from the net surplus earnings of the company as hereinafter stipulated and not otherwise  *  *  *  interest  *  *  *  at the rate of six per cent. per annum, payable semi-annually in equal installments on the first days of January and July in each year, before any dividends are paid on the stock of the company."

CASES IN CHANCERY, 1915.          423

*84 N. J. Eq.*     Wright *v.* American Finance & Securities Co.

Attached to the bond is the special contract, the purport of which is that the net proceeds derived from the sale of the bonds shall be strictly devoted to the creation of a reserve loan fund, which shall be used by the company in carrying on its legitimate corporate purposes. The earnings of the company were to be divided into special funds called operating, interest, surplus, dividend and retirement funds, in the order stated. In the first, sufficient of the earnings for operation, in the second, to maintain a sum equal to one's interest on the outstanding bonds; in the third, six per cent. of the current year's profits, which was to be transferred to the reserve loan fund, until the same reached the sum of $1,250,000; in the fourth, a sum sufficient to pay an annual dividend of six per cent. on the outstanding shares of the capital stock of the company; and lastly, the retirement fund was to be supplied, and whenever the moneys of this fund equaled one-twentieth of the principal sum of all the bonds outstanding, they were to be equally divided between the bondholders. None of these funds was ever in fact established by the defendant, and although for eight years and more the company regularly paid the interest on its bonds, it is doubtful that the interest was paid out of earnings. But while it may be, as counsel argues, that according to the strict letter, the holders of the bonds are foreclosed from recovering at law, nevertheless I take it that the bonds represent their investments in the defendant, and a corresponding obligation of the company to them, which must be taken into the reckoning in determining whether the corporation is insolvent and whether an injunction should issue and a receiver be appointed. Furthermore, the non-payment of interest on the bonds for two and one-half years last past, bears strongly upon a condition of insolvency, for it must be assumed that during all that time the defendant earned no more than was sufficient to pay its operating expenses, if it did earn that much. Other tangible and persuasive proof of insolvency is to be found in the fact that the defendant is four years in arrears to the State of New Jersey for taxes, amounting to $16,000, which it has been unable to pay. The state brought suit in this court to restrain the defendant from exercising its franchises, and also an ac-

tion in the supreme court to recover the tax. These suits are pending under an arrangement with the company to pay the arrearages in installments of $1,000 each, every three months. This will take four years. To the Hanover National Bank of New York is due, for rent, $3,800. To Finley College is owing $8,000 upon an agreement to redeem some of the securities sold by the defendant to that institution, which claim is now being pressed; and a note of $4,000 negotiated in January of this year for current use, is outstanding. To meet these debts the defendant has no funds. The offer made at the hearing by the president to pay them out of the proceeds of the sale of the Guanajuato bonds, was made under the pressure of this suit, and can have but slight bearing or influence upon the question as to whether the company is insolvent. The bonds, from the sale of which the president says he can realize sufficient to tide the company over, would have to be sold at a greatly reduced figure below par, and the capital stock to be given as a bonus would only further deplete the face value assets.

Next let us turn to the management and manipulations during the past year. To sell $50,000 of securities during the year 1914, cost the defendant $18,000, and during the same period its "face values" assets shrunk some $5,000,000. The shrinkage was neatly recovered in the next annual balance-sheet; the previous balance-sheet, as of December 31st, 1913, showed a surplus of $5,992,551.94 and liabilities for capital stock of $5,000,000. The balance-sheet above set out, of 1914, shows an almost equally handsome surplus, with a capital stock liability of only $500,000. It was accomplished by ingeniously reducing the par value of the stock from one hundred to ten dollars a share, thus enabling the defendant to add four and one-half million dollars to its "surplus," and keep that alluring item unscotched. The officials of the defendant protest that their motive in this maneuver was purely economic—the saving of an annual state tax of $3,500—but I apprehend that the use to which they put the result was otherwise quite satisfactory.

Moreover, we have this situation: the business of the company has gone into voluntary retirement for the present.

Its officers appreciate that the defendant's financial condition is desperate and inextricable, at least for the time being. Confessedly, it has no means with which to carry on its business of promotion, and I fail to see how it can survive long, even under the policy of retrenchment recently inaugurated. During the enforced retirement, the president says the company can exist on $7,000 a year, the amount of interest he expects to receive on $11,900 of bonds of the Empire Lumber Company, owned by the defendant. This is the only possible source of income and its forthcoming is, in my opinion, dubious. But, even if this sum could be realized, I think the president has underestimated the current expenses and obligations. It will require annually $4,000 for arrearages of state taxes, and $500 for franchise assessments. The treasurer of the company draws a salary of $3,000, and an assistant bookkeeper and one stenographer must be compensated. The office rent is estimated at $667. a year; and in this calculation is not included discount on outstanding notes of $29,000 and sundry office expenses. The company, in the past, has also necessarily expended annually $9,000 for the preservation of the property of the El Tiro Copper Company, and $6,000 for that of the New Jersey Steel Company.

And further, as to the management in the days of its tribulation. The president sold an Empire Lumber Company bond for $500, paid into the treasury $400, pocketed the difference, and justifies his action on the ground that the company was willing to sell these bonds at eighty per cent. of the par value. He also says that he made a profit on every bond he sold above eighty, since he ceased drawing a salary. He formerly drew a salary of $15,000 a year, but recently agreed to forego it as a part of the retrenchment plan. In January of this year he borrowed $500 from the already scant treasury of the company, for his private use, which has not been paid back. These transactions may be regarded as minor, but they vividly indicate how the business is intended to be conducted.

It is manifest from this arraignment of the defendant's affairs, that it was bankrupt from the start, in that its liabilities exceeded its assets from the beginning by a quarter of a million

dollars, and it is equally clear that if the defendant ever had cash assets of a million dollars, claimed to have been realized from the sale of its special contract bonds which, from the evidence I seriously doubt, because some of the bonds were given in exchange for securities of underlying companies, more than seventy-five per cent. of the defendant's capital is now tied up in the New Jersey Steel Company and the Guanajuato Reduction and Mines Company, over half of which is admitted to be lost and the balance to be unavailable, its eventual collection being problematical. With all of its millions of supposed assets, the defendant defaulted four successive years in the payment of its franchise tax and was not able to muster a comparatively paltry $16,000 to pay the accumulations, when pressed by suit. And just before these proceedings were instituted, it had to borrow money to pay current expenses. It seems to me that the conditions to which I have called attention must carry conviction even to the most optimistic that the defendant is hopelessly bankrupt and is insolvent, within the meaning of the statute.

"Insolvency," said Justice Dixon, in *Trust Co.* v. *Fisher & Co.*, *67 N. J. Eq. 602*, "denotes a general inability to meet pecuniary liabilities as they mature, by means of either available assets or an honest use of credit." In *Skirm* v. *Eastern Rubber Manufacturing Co.*, *57 N. J. Eq. 179* (on *p. 184*), Vice-Chancellor Reed says: "Insolvency means a general inability of a debtor to answer pecuniary engagements, and it does not follow that he is not insolvent because he may ultimately have a surplus after winding up his affairs." In *Reinhardt* v. *The Inter-State Telephone Co.*, *71 N. J. Eq. 70* (on *p. 79*), Vice-Chancellor Pitney said: "Of late years numerous corporations have been adjudged insolvent and receivers appointed therefor without any interruption of their business and before any debt has actually matured without payment, on proof merely that the corporation would be unable to meet its immediately maturing obligations, and that a scramble would ensue among its creditors, resulting in inequality of distribution of its assets." And in *Catlin* v. *Vichachi Mining Co.*, *73 N. J.*

*Eq. 286* (on *p. 290*), Vice-Chancellor Howell says: "The corporation is still running its business. It has not suspended the same for want of funds, and it was argued that inasmuch as this condition did not exist there could be no adjudication of insolvency or appointment of a receiver. I think the defendant's argument is not sound. A corporation may be insolvent and yet not have suspended its business for want of funds to carry on the same. It likewise may have suspended its business for want of funds and still be able to pay its debts if properly wound up. If either fact, insolvency or suspension exists without the other, the court may entertain the bill and proceed in a summary way to hear the affidavits, proofs and allegations which may be offered on behalf of the parties. The inquiry then goes to the questions 'insolvency' and 'resumption,' and the query is, what is meant by resumption in the second part of the section under which this action is taken. The query is fully answered by Chancellor McGill in *Fort Wayne Electric Corporation* v. *Franklin Electric Light Co., 57 N. J. Eq. 7.* It is here contended, as it was in that case, that the second requirement of the section defines insolvency so broadly as to necessarily include a suspension of business, because principally of the conjunctive construction of the sentence, and that inasmuch as the company had not entirely suspended its business the word 'resumption' puts this case out of the statute. The plain, logical and satisfactory interpretation of the language of the section given by Chancellor McGill, in the case just cited, makes it include the very situation disclosed by the testimony at bar. He says: 'I agree that the word "resume" as used in the statute, predicates some interruption of the insolvent's business, but I do not understand that it contemplates an entire suspension of all its workings. Such has been the practical interpretation the bar and the courts have given it, for manufacturing and other companies with plants in operation have constantly been adjudged to be insolvent and put in the hands of receivers, and in so doing large values have been saved to creditors and stockholders because of the salable condition of a live plant as compared with one that is dead. Insolvency carries with it inability to

presently pay indebtedness and suspension of that function, and the word "resume," used in the statute, is, I think, to be taken in the sense of taking up again that suspended function, so that payment of indebtedness as well as the operation of the work of the corporation, after temporary, partial or complete paralysis, may be resumed with safety to the public and advantage to its stockholders.'" In *Bull* v. *International Power Co., ante page 209,* Chancellor Walker held a corporation to be insolvent although it had a large balance of assets over and above its liabilities, yet showing that it had not sufficient money on hand to meet the taxes due to the State of New Jersey, salaries of officers and the administrative expenses of employes, although the president of the company declared that he could "coerce" another company to declare a dividend which would be sufficient to put cash capital into the treasury and meet its current obligations.

In arriving at my conclusions, I have borne in mind Vice-Chancellor Van Fleet's instructive views, in *Atlantic Trust Co.* v. *Consolidated Electric Storage Co., 49 N. J. Eq. 402* (at *p. 407*), who, in speaking of the exercise of the power of injunction in cases of this kind, said: "The principle which I think should control the court in the exercise of this power is this: Never to appoint a receiver unless the proof of insolvency is clear and satisfactory, and unless it also appears that there is no reasonable prospect that the corporation, if let alone, will soon be placed by the efforts of its managers in a condition of solvency. To illustrate: Where the corporation attacked is shown to be insolvent, but it also appears that its managers are honest and capable, and that they are striving to the best of their ability, with a fair prospect of success, to relieve the corporation from its embarrassment and to put it in a condition where it may prosecute its business successfully, and the property of the corporation is free from judgment or other lien under which it may be sold speedily, at a sacrifice, the court should not interfere. Mere insolvency is not enough to induce the court to act; but to induce it to act, such a state of insolvency must be shown as satisfies it that the corporation will not be able in a short

time to resume its business with safety to the public and advantage to the stockholders."

Now, what are the chances of the defendant resuming business? It entertains no hope of an infusion of new capital, and the prospect of bringing into its coffers funds to pay its bondholders their principal and interest, depends altogether upon the profitable marketing of a lot of self-created capital stock, of no intrinsic value. To permit this company to continue business would simply be inviting a duplication of the hardship from which the public is now suffering through a million dollars and more of losses sustained in investments in the defunct El Tiro Copper Company and the New Jersey Steel Company, and from which it is entitled and ought to be safeguarded. And from the maladministration of the defendant's officials, the bondholders and stockholders are also entitled to protection.

I will advise a decree adjudging the defendant insolvent, and that an injunction issue and a receiver be appointed.