COMMERCIAL TRUST COMPANY

*v.*

L. WERTHEIM COAL AND COKE COMPANY et al.

[Decided November 8th, 1917.]

1. Under the evidence in this case—*Held*, that the chattel mortgage was a lien against creditors on book accounts that arose after the date of the mortgage, and as to after-acquired chattels.

2. A lien for taxes, under the evidence in this case, has priority in the proceeds of the chattels sold.

On bill, &c.

*Mr. Willard C. Fisk,* for the complainant.

*Messrs. McDermott & Enright,* for the defendant Albert I. Drayton, trustee in bankruptcy of L. Wertheim Coal and Coke Company.

*Messrs. Vredenburgh, Wall & Carey,* for the defendants Warren Delano and Mill Creek Coal Company.

*Mr. Eugene Leake,* for the defendant William T. Payne.

*Mr. Pierre P. Garven,* for the defendant William L. Dann.

*Messrs. Collins & Corbin,* for the defendant Lehigh Valley Railroad.

LEWIS, V. C.

The bill in this case was filed to foreclose a mortgage made by L. Wertheim Coal and Coke Company to the Commercial Trust Company to secure a bond issue of two hundred and fifty bonds of $1,000 each. The mortgage was dated and recorded

on May 6th, 1912. On September 16th, 1914, the Wertheim company was declared a bankrupt, and the trustee in bankruptcy filed an answer and cross-bill to the bill to foreclose, in which he claimed:

1. That the Wertheim Company was actually insolvent upon a proper analysis of its books and balance sheet of March 31, 1912.

2. That the proper analysis which the trustee has in mind is the marking down of various asset items, viz.: trestle, buildings, leasehold, claim against Wertheims, Adams' mortgage.

3. That the mortgage is wholly void as against creditors generally, irrespective of the fact whether the creditors' claims all came into existence long after the date of the mortgage or not.

4. That the affidavit attached to the mortgage does not state the true consideration within the requirements of the Chattel Mortgage act.

5. That the mortgage was given in contemplation of insolvency.

6. That the officers who authorized the mortgage were directors, and had a self interest.

The undisputed pertinent facts in this case are as follows: "By leases, dated June 12th, 1906, and April 30th, 1908, the Lehigh Valley Railroad Company leased to the defendant corporation certain real estate in Jersey City to be used as a coal yard. The terms of these leases were for fifteen years from November 1st, 1906, and the annual rental reserved was one dollar per year, with the right reserved to the lessor to terminate the lease on giving not less than one year's written notice if the leased lands should be required by the lessor for railroad purposes. Under the lease of April 30th, 1908, it was further provided that the lessee should pay all taxes and assessments to be levied and assessed upon all buildings and property placed upon the demised premises, and in case of failure to pay such taxes after the same became payable, the right was reserved to the lessor to pay the same and to recover the taxes from the lessee in the same manner rent was recoverable. In the event of breach of covenant of the lease the right of re-entry was reserved to the lessor, and a like right was reserved if the property was taken in execution or attachment by creditors, or an assignment for the benefit of creditors should be made if the lessee should become bankrupt. There were further conditions giving the lessee the right to remove any structures placed there by it upon

the property if the same could be removed without damage to the land; and a covenant by the lessor in the event of the termination of the lease, by notice or otherwise, to purchase the improvements placed on the land by the lessee, and valuation to be fixed by agreement or by arbitration not exceeding $30,000 for the first five years of the term; $25,000 for the second five years, and $20,000 for the last five years of the term. Improvements by way of railroad trestles, office buildings, stables, &c., were placed on the land by the lessee at its expense, the cost of these improvements being greatly in excess of the amount at which the lessor in the lease agreed to take them.

On May 6th, 1912, the Wertheim company executed a trust mortgage to the complainant to secure an issue of bonds, including in the mortgage the coal trestles, buildings and other improvements placed on the leased land, but excluding the leases themselves, which were, under their terms, non-assignable.

On December 20th, 1913, taxes for the years 1913-1914 upon the improvements on this property became payable to Jersey City, and under the thirty days' clause of the lease should have been paid by January 19th, 1914. The Wertheim company defaulted in the payment of these taxes and has never paid them.

On September 16th, 1914, default having been made under the mortgage, the complainant's bill to foreclose was filed in this cause, and on the same date receivers were appointed with directions to take possession of the mortgaged assets and to collect in the assets to be held by the court pending foreclosure. The receivers qualified, and on September 17th took actual physical possession of the coal trestles, office buildings and other structures on the leased lands.

At about noon on September 17th, 1914, the railroad company caused a notice of termination of the lease to be served upon one of the officers of the Wertheim company; and subsequently, on the same day, attempted to take possession of the trestles and other buildings in question, but found the receivers appointed by this court then in actual physical possession of the property.

On September 25th, 1914, the railroad company paid to Jersey City the tax which became due December 20th, 1913.

On December 17th, 1914, as already set forth, an involuntary petition in bankruptcy was filed against the Wertheim company and on that day a receiver was appointed and qualified.

Prior to November 1st, 1914, the Lehigh Valley Railroad Company sent a bill to the Wertheim company, which was received by the receivers, dated November 1st, 1914, being a bill for the rent of the site for the coal trestles and yard in Jersey City for one year, the term ending October 31st, 1915, with directions to forward payment to the treasurer of the company at Philadelphia. This was the annual rental reserved under the lease for the year ending November 1st, 1915. The receivers forwarded the amount of the rent and received back a receipt therefor, dated November 4th, 1914, which they now hold.

The Lehigh Valley Railroad Company has also filed a cross-bill asking that it be decreed that the railroad company is in lawful possession of the trestles and permanent structures on the leased property, and has been in such possession since September 17th, 1914; or in the event that the court should decree that the railroad company has not been in possession since September 17th, 1914, that it then decree that the railroad company has a prior lien on the proceeds of sale of the chattels under foreclosure for taxes and interest thereon paid by the railroad company subsequent to September 17th, 1914.

On and prior to December 15th, 1909, two of the defendants, Max Isenstein and William Dann, were stockholders, and the vice-president, secretary and treasurer, respectively, of the L. Wertheim Coal and Coke Company.

Isenstein owned stock for which he paid $32,500; and the defendant Dann owned stock for which he paid $57,000. These two defendants owned the majority of the stock of the Wertheim company. The company was also indebted to the defendants Isenstein and Dann in the sum of $24,000 and over. At this time the defendants were receiving as salary the sum of $10,000 a year for their services as officers of the company.

There was some dissatisfaction between Saunders Wertheim and these men, Saunders Wertheim alleging that these men were not practical coal men, and he felt that $10,000 paid them

could be saved to the company if these men could be eliminated and practical coal men installed in their places.

Isenstein and Dann wished to have the company repay to them the indebtedness of $24,000, and Saunders Wertheim suggested that he would get a purchaser to buy this stock held by Isenstein and Dann, and they stated that they would retire from the company and sell their stock at fifty cents on the dollar provided they were repaid the amount of money which they had loaned to the company.

Saunders Wertheim went to Mr. Delano and apprised him of the condition of affairs of the company, and spoke to him about the elimination of Isenstein and Dann. Mr. Delano told the Wertheims to make the best terms they could with Isenstein and Dann and he would procure for them a credit or a loan of $20,000.

On December 15th, 1909, Isenstein and Dann resigned as officers of the Wertheim company.

On December 17th, 1909, by arrangement, Isenstein and Dann went to the office of the attorney of the Wertheim company, and were told to resign as directors of the company, and they did so. At ten o'clock of that day Messrs. Delano, Payne and Van Buskirk were elected directors of the company, in place of Isenstein and Dann, and at eleven o'clock of that same day, Mr. Delano was elected vice-president of the company.

After Isenstein and Dann had resigned as directors they were requested to leave the room, and when they returned they received from the company's attorney a check for $20,000, which they immediately cashed, each receiving one-half of the proceeds. Isenstein received twenty-eight notes of the company for $1,000 each, and Dann received thirty-two notes of the company for $1,000 each, and they thereupon endorsed the stock in blank and surrendered it to the company's attorney. It was understood at that time that the $20,000 cash was to be accepted in satisfaction of the amount due from the company to the defendants Isenstein and Dann for moneys advanced by the defendants to the company, and the notes aggregating $60,000 were to be accepted in payment of the stock aggregating $96,000 held by these defendants, Isenstein and Dann. The

notes, which aggregated about $60,000, were to be paid off at the rate of $1,000 per month; the defendant Isenstein to receive $1,000 one month, and the defendant Dann to receive $1,000 the following month, and so on until the notes were fully paid. The notes were not issued by the Wertheim company until after the election of Delano and Payne and Van Buskirk as directors of the company in place of these defendants, who had previously resigned.

The situation on December 17th was that the Wertheim company purchased $96,000 worth of stock of Isenstein and Dann at fifty cents on the dollar and issued the notes in payment thereof.

By the purchase of stock of Isenstein and Dann the company was able to borrow the sum of $20,000 for which it pledged as collateral security the stock purchased from these defendants, and paid in full the indebtedness due Isenstein and Dann for moneys loaned to the company at various times.

Isenstein and Dann had been out of the board of directorate two years and several months at the time when the mortgage was given and the bonds issued, and their knowledge of the issuance of the bonds was first obtained through the attorney of the Wertheim company, who notified them to come to Jersey City and exchange their notes for bonds, which they did.

The first question is, whether at the time of the mortgage the corporation was actually insolvent, as shown by a comparison of its assets and liabilities.

The trustee in bankruptcy contends that the Wertheim company was unable to pay its maturing debts in due course and had actually defaulted upon its promissory notes; that the effect of the mortgage was to transfer to the mortgagee every transferable asset as security for a debt, which far exceeded the value of the assets, leaving the corporation wholly without assets on which it was fairly entitled to seek future credit; that the directors, nevertheless, actually intended the corporation to continue in business by seeking certain new credit, although they must be chargeable with knowledge that the corporation would have no asset with which to pay such new debt unless either the bondholders permitted the mortgage security to be ex-

hausted for that purpose, or the corporation reversed its prior existence and made profit, out of which to pay such debt; that the burden of proof of the legality of this mortgage, at least to the extent. of the bonds held by the companies represented by Mr. Delano and Mr. Payne, rests upon them since the directors in executing the mortgage were virtually dealing with themselves.

I am unable to accept these propositions of the trustee in bankruptcy. I have again examined the testimony and given consideration to the arguments in this case, and have reached the same conclusion regarding them entertained at the termination of the oral hearing before me.

The proofs of insolvency are neither clear nor satisfactory. The action of Delano and Payne and the companies which they represented was, in my judgment, characterized by good faith and fair dealing.

I do not think, from the evidence before me, that this court would have been justified in appointing a receiver in May, 1912, the date of the bond issue; and this is a test which has been applied in some cases.

But, aside from this, at the time of the hearing, no creditor was in existence whose claim had accrued before the mortgage was made. They owed no one, and in the year immediately preceding the bond issue they had made a net profit of $5,550.81.

. The concern was an active one, and the evidence does not indicate a well-laid plan for the cessation of activities. It had never stopped business, and had enough assets to pay its debts if it had liquidated at the time of the bond issue.

The project did not emanate from Delano or Payne. It was brought to their attention by the Wertheims and their counsel, Mr. Eugene Leake. It was conceived for the benefit of the Wertheim company, and there is nothing which shows that the Mill Creek Coal Company or the Payne company improperly secured anything from it or profited on the coal sold.

The plan resulted in the doing away with the large salaries payable to Isenstein and Dann, and released their claims against the Wertheim company.

Immediately upon the entrance of the new interests into the Wertheim directorate regular audits were made of the business,

and the business generally conducted in an open and up-to-date manner.

I cannot agree with the view advanced that the life of the Wertheim company was improperly extended by the entrance of 'Delano and Payne, or by the financial project which they undertook upon the suggestion of the Wertheims and their counsel. Both continued furnishing it with coal for some time after the making of the mortgage, and the company went right on with its ordinary business.

The fact that money is needed to finance the corporation or to continue its life, does not mean that it is compelled to close its doors; and there was every indication that when the mortgage was made, the corporation, if let alone, would have succeeded and progressed.

The trustee in the case under consideration represents only creditors who have sold to the Wertheim company knowing the mortgage was recorded. They, therefore, had notice. There certainly is nothing fraudulent in this aspect of the case.

There is nothing presented that leads me to the belief that insolvency was contemplated. The mortgage undertaking was for the purpose of continuing the business under more advantageous circumstances than those which had hitherto prevailed. *Bergen* v. *Rogers,* 73 *N. J. Eq.* 238; *Empire State Trust Co.* v. *Fisher,* 67 *N. J. Eq.* 602; *Wright* v. *American Finance and Securities Co.,* 93 *Atl. Rep.* 862; *Regina Music Box Co.* v. *Otto,* 65 *N. J. Eq.* 582; *Cope* v. *Walton & Co.,* 79 *N. J. Eq.* 165; *Cogan* v. *Conover Mfg. Co.,* 69 *N. J. Eq.* 809.

Another point of attack by the trustee is as to the sufficiency of the mortgagee's affidavit of consideration. I have examined the affidavit in connection with the mortgage, and it seems to be in substantial compliance with the statute. It not only refers to the mortgage, but in express language sets forth the terms of this instrument and the cause of its execution. The plan relating to the issue of bonds is also clearly explained. *Fletcher* v. *Bonnet,* 51 *N. J. Eq.* 615; *Camden Safe Deposit Co.* v. *Burlington, &c., Co.,* 33 *Atl. Rep.* 479; *Breit* v. *Salferino,* 77 *N. J. Law* 436.

A further question raised is as to the power to mortgage after-acquired property. The complainant's mortgage is like many others in this regard. The instrument not only covered all chattels and book accounts then owned by the mortgagor, but provided that the lien should extend to all after-acquired chattels and book accounts that should be substituted in the regular course of business for those existing at the date of the mortgage. In the case of *Smithurst* v. *Edmund, 14 N. J. Eq. 408,* the right to mortgage after-acquired property was first established in this state, and that case has been followed by a long line of subsequent decisions. *Lister* v. *Simpson, 38 N. J. Eq. 438; Bouvinger* v. *Evening Union Printing Co., 65 Atl. Rep. 482.*

My conclusion is that the chattel mortgage was a lien as against creditors on book accounts that arose after the date of the mortgage and as to chattels acquired after the date of the mortgage. To hold otherwise, seems to me, would be to destroy the lien of any mortgage of this character.

The last question to be decided is presented by the Lehigh Valley Railroad Company, which company contends that the receivers have no right in the trestles and permanent structures which, it claims, are part of the real estate leased by them to the Wertheim company, and which it claims to be lawfully in its possession since September 17th, 1914.

I am in accord with the complainant's views in this regard. In the first place, the default under the lease for the non-payment of tax for 1913 was effective January 19th, 1914, and no action to enforce a forfeiture was taken by the railroad company until September 17th, 1914, at which time the receivers of this court were in possession of the property. This delay is, in effect, a waiver of the default in equity where forfeitures are not regarded with favor. *Grigg* v. *Landis, 21 N. J. Eq. 494.* Some definite action must be taken to claim a forfeiture, and it is well settled that if such action is taken after a lapse of time this constitutes a waiver of the right to declare a forfeiture. *24 Cyc. 1364.* It has been held that the lessor may waive the forfeiture by neglecting to assert his right within a reasonable time after the default. *24 Cyc. 1364.* Furthermore, the railroad

company has never taken possession of the trestles and structures under the default in the lease for the non-payment of taxes, because service of the notice on one of the officers of the Wertheim company on September 17th, 1914, after the appointment of receivers in this cause, was of no effect, and the subsequent service of notice on the receivers or any attempt to oust them from possession was ineffective without the permission of this court first obtained for such action.

The tender of a bill for rent reserved under the lease for the year commencing November 1st, 1914, and the acceptance by the railroad company of payments thereunder, was a waiver of any defaults under the lease which existed prior to that date. It is claimed by the company that the agent who mailed the bill for rent had no authority; but it would appear that the company is estopped from denying this authority by the acceptance of the rent. In *Levy* v. *Blackmore, 67 Atl. Rep. 1022,* Vice-Chancellor Howell says:

"But even conceding the position of the landlord, and conceding that the tenant did violate the covenant, and conceding still further that the violation operated as a forfeiture, and that due notice was given thereof, and everything done by the landlord to conserve what he thought were his rights, it still appears that the landlord has accepted the rent from the beginning of the lease down to the present time. This operates as a waiver of any forfeiture which may have been incurred during that period."

Equity will relieve against forfeiture where compensation can be made. The Lehigh company was entitled to rent and taxes. The former had been paid, and my conclusion as to the latter is that the company had a prior lien on the proceeds of the sale of the chattels under forfeiture for taxes and interest thereon paid by the company subsequent to September 17th, 1914.

A decree may be entered in accordance with the above views.